# In the United States Court of Federal Claims

No. 25-1956
Filed: June 24, 2026
Reissued: July 6, 2026[†]

|  |  |
|---|---|
| **THE TOOTA GROUP, LLC,** | |
| *Plaintiff*, | |
| **v.** | |
| **THE UNITED STATES,** | |
| *Defendant.* | |

*David P.J. Timm*, Burr & Forman LLP, Washington, DC, for Plaintiff.

*Patrick S. Angulo*, Trial Attorney, *William J. Grimaldi,* Assistant Director, *Patricia M. McCarthy,* Director, and *Brett A. Shumate*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

Friction is a predator that feeds on motion; ambiguous contract requirements are similar, preying on a contractor's time and resources before work begins. This protest arises from a series of Requests for Quotations ("RFQs") for runflat lubricant used by military vehicles. The case reaches the Court in an unusually convoluted posture, complicated by the absence of an active solicitation and actions by separate but connected agencies, as well as the parties' disagreement on nearly every issue. Plaintiff, The Toota Group, LLC ("Toota"), challenges several unsuccessful attempts to supply runflat lubricant, alleging that unclear testing requirements, delayed or denied qualification efforts, and the cancellation or restructuring of multiple procurements prevented it from equal competition. Because Toota failed to provide an adequate proposal, and for additional reasons supported by the record, the Court **DENIES** Toota's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 18), and **GRANTS** the United States' Cross-Motion, (Def.'s xMJAR, ECF No. 19).

---

[†] This Opinion was originally issued under seal, (ECF No. 33), and the parties were directed to file a notice of redactions consistent with the Court's instructions. That Notice was filed on July 2, 2026. (ECF No. 35). The Court accepts all jointly proposed redactions. The sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

## I.    Background

To ensure continued vehicle operation in the event of a tire puncture, the United States military employs runflat tire systems across a range of tactical vehicles.[1] (Administrative Record ("AR") at 1, 2082 (listing vehicles), ECF No. 16). Runflat systems allow a vehicle to remain operational for a limited period—long enough to reach a secure location—while also serving as critical components of an integrated vehicular weapons system engineered with precise specifications to maintain the platform's overall performance. (AR 8; Pl.'s MJAR at 14; Def.'s xMJAR at 4). Structurally, a runflat system is typically a ring composed of durable material, such as rubber or polymer, fixed around the wheel. (AR 38 (listing wheel components)). If the tire loses pressure, this ring supports the vehicle's weight to ensure continued safe handling. (AR 2355).



(AR 1556).

Although a runflat system consists of multiple parts, this protest focuses centrally on runflat lubricant.[2] (Compl. at 1, ECF No. 1). Applied within the tire cavity to reduce friction and

---

[1] These vehicles include: the High Mobility Multipurpose Wheeled Vehicle ("Humvee"); Joint Light Tactical Vehicle ("JLTV"); MaxxPro Dash; Oshkosh M-ATV; Husky Vehicle Mounted Mine Detection ("Husky VMMD"); and the Stryker. (AR 2082). In terms of fleet density, Humvees is the largest user, thus the Court refers to Humvees most often. (*Id.*). Unless reference to a specific platform is necessary to the facts or analysis, the Court refers to this group collectively as "Military Vehicles."

[2] The Technical Data Package ("TDP") lists drawings, which describe a full runflat system, including six components: (1) rim and bolt assembly, (2) rim, (3) tire, (4) runflat, (5) spacer, and (6) runflat lubricant. (AR 67).

2

heat, the material allows the vehicle to continue operating long enough for personnel to evacuate or reach safety. (Am. Compl. at 12, ECF No. 12; Pl.'s MJAR at 14; Def.'s xMJAR at 3–4).

The military issued the initial procurement for runflat lubricant in 1995.[3] (AR 1). Around that time, AM General, an automotive manufacturer that builds military and commercial vehicles using runflat technology, created Drawing 12460308 ("the Drawing"). (AR 1, 75); AM General, https://www.amgeneral.com/ (last visited June 8, 2026) [https://perma.cc/U69V-5Z6C]. This is not a conventional drawing but rather a specification sheet setting out the product's required characteristics and performance criteria:



(AR 1).

The Drawing identifies two approved forms of the lubricant (tube and drum) and includes six notes describing the characteristics of the approved product. (AR 1). The Drawing references "ATPD 2099C," which is the military's technical standard for Humvee requirements, and the lubricant's Quality Assurance Provisions ("QAP"). (*Id.*). The QAP describes the inspections required to verify conformance with the Drawing. (AR 2–3). Notes 1, 2A, and 2B set out the physical properties of the lubricant, including its composition, appearance, solubility, pH level,

---

[3] Runflat Lubricant National Stock Numbers ("NSN") 2640-01-419-6200 and 2640-01-457-5552 (the "Lubricant").

specific gravity, and water content. (AR 1). Note 2C specifies a centrifugal-force test requiring that ███████████████████████████████████████████████████. (*Id.*). The Drawing also references the applicable QAP, which provides the test method for Note 2C's centrifugal-force requirement and states that ███████████████████ ███████████████████████████. (AR 1, 3–4, 7). The final note, Note 6, describes a performance test for the entire runflat system, requiring a fully assembled system installed on a Humvee to complete a ██████████████████████ under ATPD 2099C. (AR 1). Unlike Note 2C, this test pertains to the performance of the *complete* runflat system rather than the lubricant alone. (*Id.*). The Drawing notes that Hutchinson Industries, Inc. ("Hutchinson"), is an approved source of supply. (*Id.*).

Pursuant to Defense Logistics Agency ("DLA") Land and Maritime guidance, prospective offerors for the lubricant may obtain award through one of two types of submissions: (1) a Source Approval Request ("SAR") to become an approved source for the lubricant, or (2) an Alternate Offer under an active solicitation so that its product may be evaluated for potential approval and consideration for award. (AR 44). DLA defined these processes as:

> Source Approval Request (SAR) – A Source Approval Request can be submitted at any time and is a package of information provided by a prospective new supplier to become an approved source for procurement of a National Stock Number (NSN). This package must contain all technical data needed to demonstrate competence to manufacture the NSN to the same, or better, level of quality than the current approved source(s). [ ] To be eligible for source approval, the NSN must be currently procured on an "other than full and open competition" basis[.]
>
> . . .
>
> Alternate Offer (AO) – An "Alternate Offer" is submitted for evaluation against an active solicitation so that a company and its product information may be reviewed, potentially qualifying the company as an "Approved Source" on the current and future solicitations. When submitting an alternate offer for a specific solicitation, this should be clearly stated in the package cover letter, along with the solicitation number and the name of the Contracting Officer listed on the solicitation. The solicitation number must be included in the package for it to be considered an alternate offer.

(*Id.* (emphasis removed)). To qualify as an approved source of supply through the SAR/Alternate Offer processes, an applicant must demonstrate capability equal to or better than the current approved source, in this case, Hutchinson. (AR 45). DLA informed applicants that they should submit the most complete technical data package possible, including all items required under its issued guidance. (*Id.*). Required elements include drawings, manufacturing plans, comparative analyses, certifications, and test plans. (AR 49).

The record reflects that Toota's efforts to obtain an evaluation of its submissions and award decisions have proceeded through a lengthy and, at times, disjointed administrative

4

history. Beginning in late 2024, DLA issued two related RFQs that incorporated the DLA Master Solicitation for Automated Simplified Acquisitions and the mandatory FAR clause for simplified acquisitions involving non-commercial products or services.[4] (AR 68, 83, 95, 115); FAR 52.213-4. Each RFQ referenced the Drawing and the QAP, required conformance with those documents, and permitted unapproved sources to submit alternate offers. (AR 75, 102). The RFQs also required first article testing within sixty days of award.[5] (AR 70, 97). Toota submitted its initial SAR package in October 2024, reflecting its intention to supply lubricant manufactured by Run Flat International, an English company. (AR 905).

DLA's guidance informs unapproved offerors that they could seek approval from the design activity, the U.S. Army Tank-Automotive and Armaments Command ("TACOM").[6] (AR 44). In February of 2025, DLA notified Toota that TACOM's engineering support activity ("ESA") had preliminarily rejected Toota's submission, explaining that it had not demonstrated compliance with Notes 2 (material) or 6 (performance) of the Drawing and had not provided sufficient performance data. (AR 1239, 1247). In the months that followed, Toota and TACOM engaged in extended discussions about potential resubmission and testing. (AR 1239–454). During those conversations, TACOM determined that the lubricant was used on additional weapons systems beyond the Humvee platform identified in Toota's original submission and advised that the SAR would require review by the ESAs for those systems. (AR 686–93, 1976–77). TACOM invited Toota to resubmit while the Army evaluated that issue, and Toota did so. (AR 1854). In the same month that it resubmitted its proposal, Toota questioned solicitation language identifying the lubricant as a commercial-off-the-shelf ("COTS") item. (AR 131). DLA clarified that the COTS designation did not alter the item's source-controlled nature. (AR 129). DLA subsequently canceled the pending RFQs to remove the COTS designation. (*Id.*). Internal DLA correspondence reflected uncertainty regarding whether the lubricant was properly designated as a commercial item. (AR 1481).

Around the same time, DLA issued another RFQ invoking Special Emergency Procurement Authority ("SEPA") and FAR 6.302-2.[7] (AR 134–35). Aside from invoking these

---

[4] RFQ SPE7L7-25-T-1655; RFQ SPE7L7-25-T-3802.

[5] "First article testing" is a pre-production evaluation in which the Government requires a contractor to furnish an initial unit for testing to ensure the contractor can produce an item that conforms to all contract requirements before authorizing full-rate production. FAR 9.302–303.
[6] The term "design activity" refers to the Government or contractor entity charged with the design and configuration control of an item, including preparing and maintaining the associated design documents. FAR 46.101. This role may be performed by the original developer or by any organization to which design responsibility has subsequently been assigned. *Id.*

[7] RFQ SPE7L4-25-Q-0165. This RFQ is discussed in greater detail below ("RFQ No. 0165") because it was the subject of Toota's Government Accountability Office ("GAO") protest and led DLA to acknowledge error. After the post-award protest was filed, the contracting officer issued a memorandum stating that DLA would cancel the underlying contract and concluding

5

distinct statutory authorities, the reissued RFQs again referenced the Drawing, required conformance with the Drawing and QAP, and permitted alternate offers. (AR 138). After receiving bids from Toota and Hutchinson, DLA identified Hutchinson's bid as the best value, noting that Toota's bid was an alternate part from a non-approved source. (AR 157). DLA awarded the contract to Hutchinson. (AR 309 (awarding RFQ SPE7L4-25-Q-0165)). Toota filed both pre-award and post-award protests at the Government Accountability Office ("GAO"), asserting, among other things, that the agency had not provided the requisite justification. (AR 435, 452). DLA moved to dismiss, maintaining that no justification was required because the procurement was conducted under SEPA. (AR 714–17). After Toota's response, the contracting officer issued a memorandum concluding that it was in DLA's best interests to cancel the RFQ and the award to Hutchinson. (AR 759). The memorandum acknowledged that DLA had invoked conflicting authorities—FAR 6.302-2 and SEPA—without adequate documentation, that the justification for awarding the contract to Hutchinson was insufficient, that a threshold eligibility requirement had not been considered, and that Toota's alternate offer had neither been evaluated nor the failure to evaluate it explained. (*Id.*). DLA filed a second request for dismissal, noting that although Toota's protest was "not clearly meritorious," it raised questions about the drafting of the RFQ and the evaluation. (AR 760). DLA canceled the solicitation and award, and GAO dismissed the protest as academic the same week. (AR 783).

Upon Toota's request for a status update, TACOM learned that the DLA employee assigned to the resubmission had neither forwarded the package nor taken any action on it before resignation, resulting in Toota's submission remaining dormant. (AR 1989, 2010, 2016, 2021). TACOM relayed this information to Toota and began its review in early August. (AR 2379). In October, TACOM reported that the evaluation remained underway but had been delayed by the governmental lapse in appropriations. (AR 2095). In the absence of any definitive action by the agency, Toota filed this protest three days after appropriations had been restored. (Compl.); U.S. House of Representatives, HISTORY, ART & ARCHIVES, FUNDING GAPS AND SHUTDOWNS IN THE FEDERAL GOVERNMENT, https://history.house.gov/Institution/Shutdown/Government-Shutdowns (last visited June 3, 2026) [https://perma.cc/S72Z-WM24]. The following week, after the United States represented that DLA was actively working to complete the review, the Court granted the Government's request to stay this litigation so that DLA could finalize its evaluation of Toota's SAR package. (ECF No. 8 at 3).

During that stay, DLA issued a document titled "Runflat Lubricant Qualification Requirements." (AR 2353–56). The document sets out testing requirements for the lubricant and states that any qualification testing must be conducted at the vendor's expense. (AR 2353). It converts the physical characteristics listed in Drawing Note 2A into a chemical-analysis test and reiterates the centrifugal-force test contained in Note 2C and the QAP. (*Id.*). The document also introduces new testing obligations, including "Testing and Certification of Compatibility of Runflat Lubricant," which requires vendors to obtain certifications that the proposed lubricant is

---

that RFQ No. 0165 had invoked SEPA without adequately documenting the basis for doing so. (AR 759). The memorandum further noted that DLA had not properly considered the Enhanced Joint Certification Program access-eligibility requirement and had not evaluated Toota's alternate offer. (*Id.*). Following issuance of the memorandum and the canceled contract, the GAO dismissed the protest as academic. (AR 783).

compatible with all rubbers used in the tire, wheel, and runflat systems, supported by letters from Michelin, Goodyear, and Bridgestone confirming that the lubricant does not degrade tire performance or void warranties. (*Id*.). In addition, without expressly referencing Note 6, the Qualification Requirements impose performance testing on multiple vehicles—including the Humvee, JLTV, MATV, and MaxxPro Dash—to verify the performance of the total runflat system. (*Id*.).

In late 2025, TACOM informed Toota that it denied Toota's resubmission, identifying deficiencies across multiple SAR elements and concluding that the submission satisfied only two of the nine required components. (AR 2365–66, 2343). TACOM cited issues with the technical data package, verification plan, and comparative analysis; noted that the International Organization for Standardization ("ISO") certification submitted was for the incorrect vendor and did not cover runflat lubricant; and observed that the accompanying quality manual and manufacturing plan did not address lubricant or include required process sheets. (AR 1501, 1503–52, 1564–66). TACOM further found that the part drawing lacked specification-level detail, that the comparative analysis omitted necessary quantitative data, and that Toota's statement that its lubricant was compatible with "some rubbers" conflicted with the requirement for compatibility with "all military grade rubbers." (AR 2345, 1583, 1561). Important to Toota's claims in this protest, TACOM also noted that required testing remained incomplete and referenced the testing requirements associated with Notes 2A, 2B, 2C, and 6 of the Drawing. (AR 2346, 2353). The denial additionally relied on the new expectations imposed by the issuance of "Runflat Lubricant Qualification Requirements," including performance testing on the other military vehicles, certification letters from tire companies confirming lubricant compatibility with all rubber types, and affirmation that the lubricant would not degrade tire performance or void warranties. (AR 2353–56). Notably, although DLA had previously instructed Toota not to conduct the Note 6 performance test, the agency cited the absence of that testing as a deficiency of its package. (AR 1347, 2093).

Given this final denial, Toota persisted with this protest and immediately amended its Complaint. (Am. Compl.). Therein, Toota asserts claims that DLA unlawfully restricted full and open competition, imposed unreasonable and unequal qualification requirements while failing to timely evaluate and approve Toota's SAR, disregarded guidance governing procurement practices, improperly canceled and bundled lubricant procurements in a manner that disadvantaged potential offerors, and, in the alternative, was required to solicit the lubricant as a commercial product but failed to do so. (*Id*. at 25–29).

## II.    Analysis

In its Motion for Judgment on the Administrative Record, Toota advances two main arguments. First, Toota contends that DLA violated the Competition in Contracting Act ("CICA") by unlawfully restricting competition, doing so in several ways: by imposing limits on competition without the justification CICA requires, by failing to articulate any valid basis for those restrictions, and by attempting to use SEPA to circumvent CICA's independent justification obligations. (Pl.'s MJAR at 27–29). Second, Toota argues that DLA violated statutes and acquisition regulations through a series of related failures in establishing and administering qualification requirements. (*Id*. at 29 (citing 10 U.S.C. § 3243, 41 U.S.C. § 3311, and FAR Part 9)). According to Toota, DLA never created a valid original qualification requirement, did not

promptly evaluate Toota's SAR or its alternate offers, failed to solicit additional sources or bear the required testing costs, and then issued an invalid, arbitrary, and capricious qualification requirement that was applied unequally. (*Id.* at 30–39).

For its part, the United States first contends that Toota's claims should be dismissed in substantial part because: the Court lacks jurisdiction over Count II which alleges that "DLA Impermissibly Imposed Unreasonable and Unequal Qualification Requirements and Failed to Promptly Approve Toota's SAR," (Am. Compl. at 26), and all qualification-related challenges; several claims have become moot; and Toota cannot establish standing. (Def.'s xMJAR at 14–28). According to the United States, Toota is neither an actual nor a prospective offeror and lacks the direct economic interest necessary to pursue a bid protest; alternatively, the United States also argues that Toota has waived any challenge to the lubricant solicitations. (*Id.* at 19–28 (citing 31 U.S.C. § 3351)). As to the merits, the United States argues that DLA's procurement actions were neither arbitrary nor capricious. (*Id.* at 29–45). It maintains that DLA complied with CICA, properly invoked a statutory exception to full and open competition, and lawfully relied on SEPA. (*Id.* at 29–34). The United States further asserts that the qualification requirements are not actually qualification requirements in practice, but were lawful nonetheless; that, even if 10 U.S.C. § 3243 applied, the Army satisfied its obligations; that Toota's SAR was reasonably evaluated; that the testing requirements were rational; and that DLA handled Toota's alternate offers in full accordance with governing law and regulation. (*Id.* at 35–45). The Court addresses any potential jurisdictional defects first.

### A.  *Jurisdictional Challenges and Waiver*

#### 1.  **DLA's evaluation was in connection with a procurement.**

The United States first argues that the Court lacks jurisdiction because DLA's evaluation of Toota's SAR package was not an action taken "in connection with a procurement or proposed procurement" within the meaning of 28 U.S.C. § 1491(b)(1). (Def.'s xMJAR at 15–16). In the United States' view, the SAR process is a technical review conducted by the Army, separate from DLA's procurement activities, and therefore outside the Tucker Act's reach. (*Id.* at 16). To support this position, the United States relies primarily on *Geiler/Schrudde & Zimmerman v. United States*, where the Federal Circuit declined jurisdiction over a challenge to agency actions that only might affect unidentified future procurements. (*Id.* (citing 743 F. App'x 974, 977 (Fed. Cir. 2018))). Toota responds that the United States' characterization of the SAR process is inconsistent with both the record and governing case law. (Pl.'s Resp. at 8, ECF No. 22). Toota argues that DLA's evaluation of its SAR is "in connection" with the seven lubricant solicitations (and future lubricant procurements) because the SAR process constitutes a stage of the Government's acquisition of supplies, during which the agency determines whether to add an offeror to the approved source list and thereby permit it to compete for lubricant procurements. (*Id.* at 11 (citing *Rotair Aerospace Corp. v. United States*, 173 Fed. Cl. 187, 195 (2024))). Each of the seven solicitations Toota identifies in its Amended Complaint was awarded to Hutchinson, and Toota alleges that each denial of its SAR package directly determined whether it could compete for those procurements and for future lubricant procurements that regularly recur. (*Id.* (citing AR 2366, 2343)). The Court agrees with Toota.

Determining whether the Court possesses subject-matter jurisdiction is a threshold inquiry, and in making that determination, the Court accepts as true the well-pleaded factual allegations in the complaint. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998); *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). The Tucker Act grants this Court jurisdiction over actions brought by an "interested party" objecting to "the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *OTI Am., Inc. v. United States*, 68 Fed. Cl. 108, 113 (2005). Procurement "includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *Sys. Application & Tech., Inc. v United States*, 691 F.3d 1374, 1381 (Fed. Cir. 2012). In *LAX Electronics, Inc. v. United States*, the Circuit emphasized that § 1491(b)(1)'s "in connection with" language is "very sweeping in scope" and held that jurisdiction exists where the Government has taken a "definitive position" that renders a protestor ineligible for future procurements for which it is likely to bid. 835 F. App'x 553, 558–59 (Fed. Cir. 2020). Similarly, in *Acetris Health, LLC v. United States*, the Circuit held that the Tucker Act confers jurisdiction where an agency's interpretation of law effectively excludes a protestor from future competitions. 949 F.3d 719, 728 (Fed. Cir. 2020).

Toota argues that DLA has taken two definitive positions here: its assertion that 10 U.S.C. § 3243 does not apply to lubricant procurements, and its rejection of Toota's SAR package in December 2025. (Pl.'s Resp. at 11). Both positions, Toota contends, foreclosed its ability to compete. (*Id.*). The Court agrees and finds that its own precedent reinforces that qualification-requirement disputes fall within Tucker Act jurisdiction. In *Rotair*, the Court exercised jurisdiction over a challenge to DLA's handling of qualification requirements under § 3243, even though the protestor had not submitted a SAR package. 173 Fed. Cl. at 187; *see also SAI Industries Corp. v. United States*, 60 Fed. Cl. 731, 733–734 (2004) (the Court reviewed DLA's SAR evaluation under the Tucker Act). Against this backdrop, *Geiler* is distinguishable. 743 F. App'x at 977. The protestor in *Geiler* did not identify any specific procurement or allege an intent to bid on one. *Id.* Here, by contrast, Toota identifies seven procurements and alleges that it was actively attempting to qualify for each of them.[8] The factual posture is therefore materially different.

There appears to be a consistent understanding that qualification requirements and SAR evaluations form an integral part of the procurement process. Furthermore, SAR packages need not be tied to any particular solicitation; DLA's guidance explains that a Source Approval Request may be submitted "at any time" and is the package of information a prospective supplier provides to become an approved source for procurement. (AR 44). By the United States' logic, the Court would categorically lack jurisdiction over SAR evaluations. The Court accordingly finds that, in this case, the SAR process is sufficiently intertwined with a procurement to satisfy the connective requirement of § 1491(b)(1).

---

[8] (Am. Compl. at 2 (listing RFQs SPE7L725T1655, SPE7L725T3802, SPE7L725Q1768, SPE7L425Q0165, SPE7L25Q2178, SPE7L725Q2060, and SPE7L726T1105)).

### 2.    Toota's core claims are not moot because the wrongs are likely to recur.

The United States further argues that Toota's claims are moot because all solicitations identified in the amended complaint have been canceled and because TACOM completed its SAR review on December 12, 2025. (Def.'s Mot. at 16 (citing AR 2342)). The United States suggests that the cancellation of the solicitations extinguishes any live controversy regarding those procurements, and the completion of the SAR review eliminates any basis for Toota's challenge. (*Id.* at 17). But mootness is not assessed in the abstract; it turns on whether the Court can still grant meaningful relief and whether the alleged violations are reasonably likely to recur. *DexCom, Inc. v. Abbott Diabetes Care, Inc.*, 89 F.4th 1370, 1372 n.1 (Fed. Cir. 2024) ("[T]he party asserting mootness, bears the burden of demonstrating that (1) 'there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" (internal citations omitted)). As explained below, the record demonstrates that Toota's core claims continue to present a controversy likely to recur.

Mootness is a threshold jurisdictional issue. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002); *see Gulley v. United States*, 150 Fed. Cl. 405, 413 (2020). A case becomes moot only when "the relief sought has been granted or [when] the questions originally in controversy between the parties are no longer at issue." *Chapman L. Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 939 (Fed. Cir. 2007). It would be a strained result for the Court to conclude that no live case or controversy remains while a plaintiff continues to press for relief that is plainly redressable. In the bid protest context, cancellation of the challenged solicitation often moots the protest because the procurement at issue no longer exists. *See, e.g., Madison Servs., Inc. v. United States*, 90 Fed. Cl. 673, 680 (2010); *CW Gov't Travel, Inc. v. United States*, 46 Fed. Cl. 554, 558–59 (2000); *CCL Serv. Corp. v. United States*, 43 Fed. Cl. 680, 689–90 (1999). However, this principle is not absolute. Under the voluntary-cessation doctrine, a case is not moot if the defendant halts the challenged conduct but fails to show that the violation cannot reasonably be expected to recur. *Chapman L. Firm Co.*, 490 F.3d at 939–40 (citing *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)). The Government bears a "formidable burden" to make that showing. *Friends of the Earth, Inc. v. Laidlaw Env'l Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

Toota asserts that its claims are live. (Pl.'s Resp. at 11). Toota argues that DLA's challenged conduct is likely to recur, and the record supports this concern. (*Id.* at 12). DLA declined to evaluate Toota's alternate offers under the most recent RFQ because Toota lacked a workable test under Notes 2 and 6. (*Id.* at 13 (citing AR 2083, 1347, 2093)). While DLA has conceded error in the earlier, now-canceled procurement, Toota asserts that the underlying testing deficiency persists and is poised to influence future procurements in the same manner. (*Id.* (citing AR 783)). As Toota argues, the problems enumerated in this lawsuit are not limited to a single solicitation; they instead reflect a systemic gap in DLA's qualification framework. (*Id.*). Moreover, DLA instructed Toota not to conduct Note 6 performance testing—the very testing DLA now cites as missing. (*Id.* (citing AR 1347, 2093)). The Court finds that this inconsistency underscores that the alleged violation has not been fully remedied and may recur in subsequent procurements.

Next, Toota argues that the parties' dispute over the applicability of 10 U.S.C. § 3243 remains unresolved. (Pl.'s Resp. at 11). DLA maintains that the statute does not apply to lubricant procurements, while Toota asserts that the "Runflat Lubricant Qualification Requirements" document constitutes a qualification requirement under § 3243(a). (*Id.* at 14). Such a disagreement is not academic. 10 U.S.C. § 3243 is a federal acquisition statute titled "Encouragement of new competitors: qualification requirement." Its purpose is to prevent agencies from using qualification requirements to exclude potential offerors and to ensure that any such requirements are transparent, justified, and minimally restrictive. 10 U.S.C. § 3243. Thus, even though TACOM issued a SAR decision in December 2025, the statutory dispute continues to govern the parties' rights and obligations in future procurements. A live controversy regarding this interpretation therefore persists.

Taken together, these considerations demonstrate that the United States has not met its burden to show that the alleged violations cannot reasonably be expected to recur or that the Court is unable to grant effective relief. Lubricant procurements recur regularly, DLA continues to apply the same qualification framework, and the statutory dispute under § 3243 remains active. Although the cancellation of individual solicitations may be relevant to whether a protester can show prejudice as to particular procurement actions, such cancellations do not automatically moot broader claims that the agency is unlawfully structuring or issuing procurements in the first place. While claims tied exclusively to the canceled solicitations may be dismissed as moot, Toota's broader challenges to DLA's qualification requirements and statutory compliance remain justiciable. Accordingly, the Court finds that Toota's core claims are not moot.

However, the Court agrees that Toota's delay-based component of Count II has been mooted by the agency's corrective action in December. (Def.'s xMJAR at 18; Am. Compl. at 26 (alleging, in part, that DLA failed "to [p]romptly [a]pprove Toota's SAR")). To the extent Toota advances an independent claim premised on DLA's delay in reviewing its SAR, that theory no longer presents a live controversy because no further judicial relief could redress the alleged injury. *See Flast v. Cohen*, 392 U.S. 83, 95 (1968) (a case becomes moot when "the question sought to be adjudicated has been mooted by subsequent developments"). The record establishes that DLA has now completed its evaluation, issued a written rejection, and closed the SAR review process. (AR 2353–56). Once an agency has taken the very action a plaintiff seeks to compel, a delay-based challenge is moot because a court cannot order the agency to do what it has already done. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 169 (2016). Because Toota's SAR has been fully reviewed and no further process remains to be compelled, there is no effectual relief the Court could provide, and the delay claim is therefore moot. This conclusion does not extend to the portion of Count II alleging that DLA imposed unreasonable or unequal qualification requirements; the factual circumstances surrounding the delay may remain relevant to that surviving theory.

### 3.   Toota possesses standing.

The United States next argues that Toota lacks standing because it is neither an actual nor a prospective offeror and because it cannot demonstrate the direct economic interest required under 28 U.S.C. § 1491(b)(1). (Def.'s xMJAR at 19–26). According to the United States, no

11

active solicitation exists, Toota's remaining claims are not tied to any specific procurement, and Toota cannot show a substantial chance of award. (*Id.* at 22). In support, the United States broadly contends that Toota is not presently capable of satisfying the agency's qualification requirements. It cites record evidence indicating that Toota has not demonstrated compliance with the technical specifications in the Drawing, (AR 1562; AR 1564–66), lacks a valid Joint Certification Program ("JCP") code, (AR 2344), does not hold an ISO certification that covers lubricant production, (AR 1501), and cannot rely on its manufacturer because it allegedly lacks access to export-controlled data. (Def.'s xMJAR at 24–25). In the United States' view, these deficiencies foreclose any possibility of redress and therefore defeat standing. (*Id.*). The Court disagrees.

Standing is a threshold inquiry governed by well-established principles. "The 'irreducible constitutional minimum of standing' contains three requirements." *Steel Co.*, 523 U.S. at 102 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A plaintiff must show: (1) a concrete and particularized injury in fact that is actual or imminent; (2) a causal connection between that injury and the challenged conduct; and (3) an injury likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61. Because standing is claim-specific, "a plaintiff's burden extends to 'demonstrating that it has standing for each claim.'" *BCG Fed. Corp. v. United States*, 172 Fed. Cl. 543, 551 (2023) (quoting *Owl Creek Asia I, L.P. v. United States*, 148 Fed. Cl. 614, 641 (2020), *aff'd sub nom. Fairholme Funds, Inc. v. United States*, 26 F.4th 1274 (Fed. Cir. 2022)). Redressability is the primary point of contention. An injury is redressable when it is "'likely,' as opposed to merely 'speculative,'" that a favorable decision could remedy it. *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 38, 43 (1976)). Conversely, if "after the undoing of the government action the status quo remains in place, the alleged injury is not redressable." *Acuity Edge, Inc. v. United States*, 174 Fed. Cl. 46, 54 (2024). Thus, the Court must determine whether Toota remains capable of receiving meaningful relief and whether the alleged procurement-related harm continues to affect its competitive position.

To proceed under § 1491(b)(1), a protestor must also qualify as an "interested party," meaning an actual or prospective bidder with a direct economic interest in the procurement. *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001); *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012). As a general matter, a protestor demonstrates a direct economic interest by showing that, but for the alleged procurement error, it had a substantial chance of receiving the award. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006). Prejudice is a factual question. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005).

In pre-award protests, the Federal Circuit has recognized that a "but-for" analysis may be impossible because no award decision has yet occurred. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009). In that posture, a protestor need only show a non-trivial competitive injury that can be redressed by judicial relief. *Id.* at 1362. But when the record provides an "adequate factual predicate" to assess whether the protestor would have had a substantial chance of award, the traditional prejudice standard applies even before award. *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1349 (Fed. Cir. 2013); *see Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 n.3 (Fed. Cir. 2020).

12

Toota responds that it satisfies the "prospective offeror" standard articulated in *Acetris*, which recognizes standing where future procurements are virtually certain to occur and the protestor is very likely to bid. (Pl.'s Resp. at 16 (citing 949 F.3d at 728)). Toota alleges both elements, and the United States does not dispute them. Toota further argues that the United States cannot rely on obstacles of its own making to defeat standing. (*Id*. at 18–19). The record reflects that DLA expressly instructed Toota not to conduct the Note 6 test. (AR 1347; AR 2093). Toota contends it would be improper for the United States to now cite the absence of that same testing as evidence that Toota cannot qualify. (Pl.'s Resp. at 18). Toota correctly notes that decisions such as *Cubic Defense Systems, Inc. v. United States* and *Rotair* caution against allowing an agency to manufacture standing defects through its own conduct. (*Id.* (citing 45 Fed. Cl. 239 (1999), 173 Fed. Cl. at 197)). Toota also challenges the United States' factual assertions. It notes that it is JCP certified, that its manufacturer does not require technical data, and that any ISO scope issue is clerical. (*Id.* at 19–20 (citing AR 260–61)). Toota further asserts that it completed Note 2 testing and was prepared to conduct Note 6 testing until DLA instructed it not to proceed. (*Id.* at 13 (citing Compl. Ex. R; AR 1347; AR 2093)). Whether Toota can ultimately meet the technical requirements is, in Toota's view, a merits question—not a jurisdictional one.

It is the Court's role to determine whether the findings that foreclosed Toota from further consideration were based on lawful criteria and whether those determinations were arbitrary and capricious. Allowing the United States to rely on the very same disputed findings to defeat standing at the dismissal stage would be circular: it would assume the validity of the agency's actions to avoid judicial review of those actions. Such an approach would permit an agency to insulate potentially unlawful conduct from scrutiny and would contravene the public policy underlying § 1491(b), which ensures that disappointed offerors have a meaningful avenue to challenge procurement decisions alleged to be improper. By the United States' actions, Toota was "deprived of the opportunity to compete for the provision of" the services that were sought in the canceled procurement. *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (finding that loss of "the opportunity to compete" affected potential offerors' direct economic interest). At the dismissal stage, the Court must resolve factual disputes in Toota's favor. The United States' arguments largely go to the merits of whether Toota can qualify, not to whether it is an "interested party." Federal Circuit precedent suggests that a protestor excluded from future procurements by an agency's definitive position may qualify as a prospective offeror even without an active solicitation. *See LAX Elecs.*, 835 F. App'x at 558–59; *Acetris Health*, 949 F.3d at 727. The Court therefore concludes that Toota has adequately alleged injury, causation, and redressability, and that it qualifies as an interested party with standing to pursue its claims.

### 4.    *Blue & Gold* does not foreclose Toota's claims.

The United States also argues that, even if Toota has standing, many of its claims are barred under *Blue & Gold Fleet, L.P. v. United States*. (Def.'s xMJAR at 26 (citing 492 F.3d 1308, 1313 (Fed. Cir. 2007))). Under *Blue & Gold*, when a bidder declines to challenge a patent error in a solicitation before the close of bidding, it waives any later attempt to assert that objection in a protest before this Court. *Blue & Gold Fleet*, 492 F.3d at 1313. According to the United States, each of the lubricant solicitations contained the same patent features Toota challenges here: identification of Hutchinson as the lone approved source; reliance on the Drawing; use of simplified acquisition procedures and, where applicable, SEPA; and the

13

invitation for alternate offers through the SAR process. (Def.'s xMJAR at 27). Because Toota did not protest six of the seven solicitations before the close of bidding, the government contends that Toota waived its objections. (*Id.*). The United States further argues that Toota's GAO protests of RFQ 0165 did not preserve the claims asserted in this action, and that case law supports a finding of waiver where a protester raises different arguments at GAO and in the Court of Federal Claims. (*Id.* at 28 (citing *Synergy Sols., Inc. v. United States*, 133 Fed. Cl. 716, 739–40 (2017))).

Toota counters that the United States is overstating the reach of *Blue & Gold*. Toota notes that the doctrine does not require a "formal protest" to avoid waiver. (Pl.'s Resp. at 21 (citing *Lab'y Corp. of Am. v. United States*, 108 Fed. Cl. 549, 566 (2012))). Toota asserts that it has engaged DLA continuously since 2024 regarding its SAR, alternate offers, and related disputes, and that these communications put the agency on notice of the same concerns raised here. (*Id.*). Toota also disputes the premise that six solicitations reached a "close of the bidding process," asserting that only two of the protested RFQs ever reached a bid-closing date. (*Id.*). Toota filed a pre-award protest of one, and another was open for only eleven days before DLA canceled it without evaluation. (*Id.*). As to *Synergy*, Toota argues that the case does not stand for the proposition that arguments not raised at GAO are waived at this Court; rather, *Synergy* involved a protester who waited months to challenge solicitation terms and raised them only after learning it would not receive the award. (*Id.* at 22 (citing 133 Fed. Cl. 716)). Toota maintains that it has not "sat on its hands." (*Id.*). Finally, Toota argues that the United States' position is contradictory—criticizing Toota both for not protesting canceled solicitations and for not waiting to protest an active one—and that its core challenge, focusing on DLA's compliance with 10 U.S.C. § 3243 and the SAR process, does not fit within the pre-award/post-award framework of *Blue & Gold*. (*Id.*).

Under the *Blue & Gold* waiver rule, a plaintiff waives its claim if it (1) "ha[d] the opportunity to object to the terms of a government solicitation containing a patent error," and (2) "fail[ed] to do so prior to the close of the bidding process." *Blue & Gold Fleet*, 492 F.3d at 1313. The doctrine is intended to prevent offerors from waiting to see whether they receive an award before raising solicitation-level challenges. *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012). In 2015, the Federal Circuit held that "mere notice of dissatisfaction or objection is insufficient to preserve [the protestor's] defective-solicitation challenge." *Bannum, Inc. v. United States,* 779 F.3d 1376, 1380 (Fed. Cir. 2015). *Bannum* reasoned that clarity is important for expeditious resolution of protest claims:

> Requiring that the prescribed formal routes for protest be followed (to avoid waiver) reduces uncertainty about whether the issue is joined and must be resolved, and thereby helps prevent both the wasted and duplicative expenses (of all bidders and the government) and the delayed implementation of the contract that would likely follow from laxer standards of timely presentation of solicitation challenges.

*Id*. At the same time, the Court has recognized that *Blue & Gold* does not require a formal protest and that meaningful, timely engagement with the agency may suffice. In *DGR Associates, Inc. v. United States*, the Court held that *Blue & Gold* did not apply because the protestor had in fact

challenged the solicitation before the closing date for proposals. 94 Fed. Cl. 189, 202–04 (2010). The Court rejected the notion that a protestor must file a formal agency protest or initiate an action in this Court before the close of bidding to avoid waiver. *Id*. at 202–03. That view, the Court explained, was inconsistent with the provision of the FAR encouraging parties to first raise concerns with the contracting officer. *Id*. (citing 48 C.F.R. § 33.103). The Court concluded that "the correct interpretation of *Blue & Gold* [ ] is that, if a party has challenged a solicitation impropriety before the close of the bidding process, the party is not precluded from later filing its protest at the Court of Federal Claims." *Id*. at 203. Other decisions have adopted the same reading. *See, e.g., Lab'y Corp.*, 108 Fed. Cl. at 566; *Distributed Sols., Inc. v. United States*, 104 Fed. Cl. 368, 394 (2012).

Applying these principles, the waiver question is not as straightforward as the United States suggests. The United States' position is correct only if the solicitations at issue reached a bid-closing date and contained patent defects that Toota failed to raise. *See ATSC Aviation, LLC v. United States,* 141 Fed. Cl. 670, 694 (2019) (citing *COMINT,* 700 F.3d at 1382). Toota's assertion that most solicitations were canceled before closing, if supported by the record, undermines the predicate for waiver. Likewise, Toota's continuous engagement with DLA regarding its SAR and alternate offers complicates the government's contention that Toota remained silent in the face of patent defects. The United States' reliance on *Synergy* is also in tension with the facts here, as *Synergy* involved a protester who waited months to challenge solicitation terms and raised them only after an adverse award. *Synergy Sols.*, 133 Fed. Cl. at 738. Finally, Toota's statutory and process-based claims do not fit neatly within the *Blue & Gold* framework, which is directed at solicitation-specific defects. The combination of canceled solicitations, Toota's pre-award protest of the only solicitation that reached closing, its ongoing engagement with the agency, and the statutory nature of several claims makes a strict application of *Blue & Gold* inappropriate. *See* 492 F.3d at 1313.

The Court concludes that it possesses jurisdiction under 28 U.S.C. § 1491(b)(1) to review Toota's challenges to DLA's qualification requirements and its evaluation of Toota's SAR package. The administrative record demonstrates that the SAR process is a mandatory stage of the United States' acquisition of runflat lubricant, directly determining whether an offeror may compete for lubricant procurements. (AR 44–47). It is clear that DLA's definitive positions—its assertion that 10 U.S.C. § 3243 does not apply to these procurements and its December 2025 denial of Toota's SAR, (AR 2366, 2343)—constitute agency actions "in connection with a procurement" as required by § 1491. The Court further finds that Toota's core claims are not moot. Although the solicitations identified in the Amended Complaint have been canceled, the record reflects that runflat lubricant procurements recur regularly and that DLA continues to apply the same qualification framework, including the disputed testing requirements under Notes 2 and 6. (AR 2083, 1347, 2093). The challenged conduct is reasonably likely to recur and has not been "completely and irrevocably eradicated." *See DexCom,* 89 F.4th at 1372 n.1. The Court further determines that Toota is an "interested party" with standing to maintain this protest. Given the recurring nature of these procurements and the direct effect of DLA's actions on Toota's competitive posture, the standing requirement is satisfied. The record also reflects that Toota preserved its objections in advance of suit. Accordingly, the Court turns to the merits of Toota's claims.

B.  *Judgment on the Administrative Record*

According to 28 U.S.C. § 1491(b)(4), the Court typically reviews agency procurement decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA standard, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013).

Judicial review of agency action under the APA typically proceeds on two tracks; the Court could find: (1) the agency's decision lacked either a rational basis or support from the administrative record or was arbitrary and capricious; and/or (2) the agency's procurement procedure involved a violation of regulation or statute. *Weeks Marine*, 575 F.3d at 1358. To obtain relief, after showing that the procuring agency violated the law or acted arbitrarily and capriciously, the protester must also show that the agency's violation was prejudicial. *Glenn Def. Marine (ASIA)*, 720 F.3d at 907. This standard is "highly deferential." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). "Under the 'arbitrary and capricious' standard[,] the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (internal quotations omitted). The Court may not substitute its own judgment for that of the agency. *Id.* But the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Even so, a "protestor's burden is particularly great . . . because the contracting officer is entrusted with a relatively high degree of discretion[.]" *Banknote Corp. of Am., v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

When reviewing an agency's procurement decisions, the Court is expected to apply a "presumption of regularity" and avoid substituting its own judgment for that of the agency. *See Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018); *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003). Additionally, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). "For that reason, procurement decisions 'invoke[] 'highly deferential' rational basis review[.]'" *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (citation omitted).

All parties move for judgment on the Administrative Record. *See* RCFC 52.1. Unlike the standard applied in summary judgment motions, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); *see also* RCFC 56. Rather, the Court's inquiry focuses on whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum*, 404 F.3d at 1356).

16

C. *CICA and SEPA*

The parties dispute whether DLA's lubricant procurements must comply with CICA's mandate for full and open competition. (Pl.'s MJAR at 27–29; Def.'s xMJAR at 29). Toota argues that DLA violated CICA for decades by restricting competition to a single approved source without ever preparing the justification required by statute. (Pl.'s MJAR at 27–28 (citing 10 U.S.C. § 3201(a))). According to Toota, the Administrative Record contains no contemporaneous justification and approval ("J&A") explaining why Hutchinson alone was permitted to supply the lubricant, and DLA's later reliance on SEPA cannot cure that defect. (*Id*. at 28). Toota further asserts that SEPA is an emergency authority available only when a procurement supports a "contingency operation," and contends that nothing in the record shows that runflat lubricant meets that statutory threshold. (*Id*. (citing 41 U.S.C. § 1903(a)(1))). Toota also points to an internal DLA memorandum acknowledging that one RFQ invoked "conflicting urgency authorities" without adequate documentation. (*Id*. at 29 (citing AR 759)).

The United States responds that Toota's premise is misplaced because the lubricant procurements were not governed by CICA's full-and-open-competition requirements at all. (Def.'s xMJAR at 29). Instead, the United States argues that, aside from the procurements invoking SEPA, each of the lubricant procurements fell squarely within the simplified acquisition procedures authorized by 10 U.S.C. § 3205 and implemented in FAR Part 13. (*Id*.). Further, the United States also argues that Toota misreads § 3205 and that its use of SEPA was warranted. (Def.'s Reply at 12, ECF No. 23). The statutory framework confirms the United States' position. The Court finds that CICA requirements did not apply to this FAR Part 13 procurement. Further, DLA's invocation of SEPA was not wrongful and its justification was sufficient.

Section 3201 codifies CICA's baseline rule: absent a statutory exception, an agency "shall obtain full and open competition[.]" 10 U.S.C. § 3201(a)(1). Section 3205 is one such exception. It authorizes simplified acquisition procedures for procurements at or below the simplified acquisition threshold and, in certain circumstances, for commercial-item procurements up to $5 million. § 3205(a). FAR 2.101 defines the simplified acquisition threshold as below $350,000 as of October 1, 2025, previously defined as below $250,000. Even when simplified procedures are used, the agency must still "promote competition to the maximum extent practicable." § 3205(c). However, simplified acquisitions are expressly exempt from CICA's full-and-open-competition requirements. *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 986 (Fed. Cir. 2019); *Fire-Trol Holdings, LLC v. United States*, 66 Fed. Cl. 36, 42 (2005); *Dubinsky v. United States*, 43 Fed. Cl. 243, 254 (1999). FAR Part 13's simplified procurement procedures confer broad discretion in evaluating quotations and make clear that the formal procedures of FAR Parts 14 and 15 "are not mandatory" in simplified acquisitions. 48 C.F.R. § 13.106-2(b)(1). It also instructs agencies to "keep documentation to a minimum." § 13.106-3(b).

Toota's claim that simplified acquisition procedures apply only to commercial products, (Pl.'s Resp. at 23), misreads the statute. As the United States notes, § 3205(a)(2)'s commercial-item requirement applies only when an agency seeks to use simplified procedures above the simplified acquisition threshold, (Def.'s Reply at 12). Stated differently, simplified

acquisition procedures may be used in two circumstances: for procurements below the simplified acquisition threshold, or for commercial-item procurements up to $5 million. 10 U.S.C. § 3205(a)(2); FAR 2.101. The lubricant RFQs fell below the simplified acquisition threshold, incorporated DLA's Master Solicitation for Automated Simplified Acquisitions, and included FAR 52.213-4, the FAR clause covering terms and conditions for simplified acquisitions. (Def.'s xMJAR at 30 (citing FAR 2.101; AR 69, 95, 137, 171, 213, 273)). Because the lubricant procurements utilizing FAR Part 13 fell below that threshold, Toota's commercial-item argument is misplaced. (*See* Def.'s Reply at 12).

The United States argues even further that Toota's attempt to impose heightened documentation requirements is inconsistent with the purpose of simplified acquisitions. (Def.'s Reply at 13). The Court agrees that Toota's argument is at odds with FAR Part 13. The United States also correctly states that the lubricant solicitations were not sole-source or brand-name procurements: DLA issued sources-sought notices, publicly posted the RFQs, and permitted alternate offers. (Def.'s xMJAR at 31). Toota itself submitted quotations multiple times despite not being the "sole source." Based on these facts, the FAR provisions governing sole-source or brand-name procurements do not apply. Given this framework, the Court concludes that FAR Part 13 governed the RFQs at issue, and CICA's full-and-open-competition requirements did not apply.

Finally, Toota argues that the record contains no adequate justification for limiting competition to a single approved source. (Pl.'s MJAR at 28). Although simplified acquisitions are exempt from CICA's formal J&A requirements, they are not exempt from justification altogether. *See* FAR 6.303-1. However, as explained above, this is not technically a sole-source procurement; the solicitations were not restrictive because they expressly invited unapproved sources to seek approval. (Def.'s xMJAR at 31). The Court finds no basis to conclude that DLA's conduct under FAR Part 13 violated applicable competition or justification requirements.

The parties next dispute the propriety of DLA's invocation of SEPA in RFQ No. 0165. (AR 134–5). Toota argues that SEPA was misused as a substitute for proper planning and to avoid CICA's justification requirements. (Pl.'s MJAR at 28). Toota emphasizes that SEPA may be invoked only when a procurement supports a contingency operation, 41 U.S.C. § 1903(a)(1), and asserts that the record contains no evidence that runflat lubricant meets that standard. (*Id.* at 28–29). Toota again relies on DLA's internal memorandum acknowledging the RFQ that improperly invoked both FAR 6.302-2 and SEPA without adequate documentation. (*Id.* at 29 (citing AR 759)).

The United States contends that its resort to SEPA was warranted, because pricing projections suggested that the anticipated value of a procurement would surpass the ordinary simplified acquisition threshold. (Def.'s xMJAR at 33). The United States points to the SEPA justification prepared for the RFQ which documented that the lubricant supports weapons systems designated as critical to operational readiness. (*Id.* (citing AR 255–56)). The United States characterizes the errors in the RFQ that were protested at the GAO as isolated, promptly corrected, and irrelevant to subsequent procurements. (*Id.* at 33–35).

18

The record supports the United States' position. Toota is correct that SEPA and FAR 6.302-2 cannot operate as concurrent justifications for the same procurement. SEPA authorizes expanded acquisition flexibilities—such as higher thresholds and streamlined procedures—when the agency head determines that a procurement is necessary to support a contingency operation, respond to specified national-security threats, or address an emergency or major disaster. 41 U.S.C. § 1903. When invoked, SEPA allows qualifying procurements to be treated as acquisitions of commercial products or services, thereby permitting the agency to dispense with otherwise applicable requirements to expedite an emergency acquisition. By contrast, FAR 6.302-2 is a statutory exception to full and open competition that permits an agency to restrict competition only when "unusual and compelling urgency" renders full and open procedures impracticable and when the United States would be seriously injured absent such limits. These two authorities serve distinct purposes and cannot be layered to justify the same action. Indeed, this precise issue was raised in Toota's GAO protest, during which DLA acknowledged that its simultaneous reliance on both statutes was erroneous. (AR 759).

Toota mischaracterizes DLA's internal communications as reflecting an improper invocation of SEPA. (Pl.'s MJAR at 29). Although it would be incorrect to invoke both SEPA and FAR 6.302-2 for the same procurement, DLA's internal communication is most accurately read as acknowledging that the error lay in the invocation of FAR 6.302-2, rather than SEPA. The internal communication states:

> I reviewed FAR 6.302-2 when I was less seasoned and assumed it was correct and never looked back. Now, a few hundred SEPA procurements later, looking at it again, I understand why you came to that conclusion. Moving forward I'm going to modify that statement to:
>
> "This solicitation is issued under Special Emergency Procurement Authority (SEPA) procedures in accordance with FAR part 18."
>
> This should meet our internal SEPA documentation requirements and adequately identify the procurement as one conducted under SEPA.

(AR 1984 (email); Pl.'s MJAR at 29).

When DLA invoked SEPA, DLA completed this justification:

| Requirement (PR, PRON, JML): 7012188198 | NSN: 2640-01-419-6200 | |
|---|---|---|
| WDSC: MRA | Project Code: N/a | |
| Qualifying Annual Requirement: N/a | Total Annual Quantity: ▇ | Percentage: ▇% |

19



> Additional Justification Information [ ]:[9] 3 a) MRAP ["Mine-Resistant Ambush-Protected vehicle"] b) Yes. ███████████████████
>
> ███████████████████████ D) SOH ["Stock On Hand"] ██████████████ e) ███ MRAP are a highly deployable weapons system and must maintain a high level of readiness. In order to mitigate time already lost in the procurement process due [to] ████████████████, every step of the acquisition must be expedited. ██ ███████████████ ["National Item Identification Number"]. NSN ["National-Stock Number"] on SEPA Listing (Attached).

> (AR 255 (REPLICATED FOR READABILITY,
> FOOTNOTE ADDED)).

The justification goes on to assert that the procurement qualifies for SEPA because it supports military operations involving actual or potential hostilities or the activation of service members during war or national emergency. (AR 255). The agency states that failure to obtain the required supplies in a timely manner would █████████████████████████. (*Id.*). It further explains that DLA was ███████████████████████████████████████. (*Id.*). Finally, the agency noted that █████████████████████████. (*Id.*).

Toota believes that this justification simply suggests that DLA failed to plan its needs in advance. (Pl.'s MJAR at 28). Even were this solicitation to proceed to award, the Court finds that the agency's justification is rational. It ties the use of SEPA to statutory authority permitting expedited procurement in support of contingency operations and explains, with specificity, the operational risks of delay, ███████████████████████████████. (AR 255). This explanation supports the conclusion that accelerated procurement was necessary.

---

[9] The omitted portion of this Justification Form states, "[i]f using #3, a–e must be addressed[.]" (AR 255). The phrase "a–e" refers to the requirement that the National Item Identification Number support a deployable weapons system identified in the May 2023 Class Determination and Findings for contingency contracting, and that all associated conditions are met—namely, that the material is needed to sustain fielded and deployable systems; operational priorities require expedited processing; delays would risk non-mission-capable status and degraded readiness; ████████████████████████████████. (AR 255–56).

SEPA expands simplified acquisition authority when certain emergency conditions exist; Toota has not shown any requirement that a CICA J&A exists when the procurement is already within simplified acquisition thresholds. Moreover, DLA canceled an RFQ after identifying documentation errors with invoking SEPA, thereby curing the defect existing with that RFQ. (AR 759). The SEPA justification for the later RFQ was adequately documented, and the record does not establish a broader pattern of misuse. Toota's SEPA-related claims do not warrant relief.

### D.  *Qualification Requirements and Evaluations*

The parties also dispute whether DLA imposed an unlawful qualification requirement. (Pl.'s MJAR at 29). "[T]he term 'qualification requirement' means a requirement for testing or other quality assurance demonstration that must be completed by an offeror before award of a contract." 10 U.S.C. § 3243; 41 U.S.C. § 3311; *see also W.G. Yates & Sons Const. Co., Inc. v. Caldera*, 192 F.3d 987, 994 (Fed. Cir. 1999) ("Qualification requirements . . . are activities which establish the experience and abilities of the bidder to assure the government that the bidder has the ability to carry out and complete the contract."). The statutory framework governing federal qualification requirements operates as a unified system in which 10 U.S.C. § 3243 and 41 U.S.C. § 3311 impose parallel mandates requiring agencies to justify in writing any pre-award testing or quality-assurance demonstration, to publish the least-restrictive qualification standards, to disclose estimated testing costs, and to provide all potential offerors a prompt and impartial opportunity to qualify. FAR Subpart 9.2 expressly implements both statutes and prescribes the procedures agencies must follow when establishing or enforcing qualification requirements, including the justification, notice, and qualification-opportunity provisions mirrored from the statutes. FAR 9.200–9.202.

 Toota argues that DLA never validly established a qualification requirement in 1995, failed to revalidate every seven years, and obstructed Toota's efforts to qualify beginning in 2024. (Pl.'s MJAR at 29–31). It further challenges Notes 2C and 6 of the Drawing as lacking purpose and contends that the December 12, 2025 testing document is unlawful because it lacks written justification, imposes unnecessary tests, and evaluates the entire runflat system rather than the lubricant alone. (*Id*. at 35–36 (citing AR 2353–56)). Toota also asserts unequal treatment, asserting that Hutchinson was not required to meet the December 2025 requirements. (*Id*. at 39).

Before addressing these arguments, it is necessary to determine whether § 3243 applies. The statute's obligations arise only when an agency has established a qualification requirement. The governing principles of 10 U.S.C. § 3243 establish several baseline obligations that apply when an agency has established a qualification requirement. First, § 3243(b)(2) requires the agency to specify in writing, and make available upon request, all requirements a prospective offeror must satisfy to become qualified. Second, § 3243(b)(4) requires the agency to provide a prospective offeror, again upon request and on a reimbursable basis, a prompt opportunity to demonstrate its ability to meet those qualification standards. Third, § 3243(c)(3) provides that a prospective offeror may not be denied the opportunity to submit an offer solely because it is not on a qualified list, provided the offeror demonstrates that it meets the qualification requirements or can meet them before award.

As explained in *Rotair*, these statutory protections are triggered only when a qualification requirement exists, and only when the offeror has requested the relevant information or has attempted to demonstrate compliance. *Rotair Aerospace Corp.*, 173 Fed. Cl. at 205–06. The Federal Circuit has stated that specifications internal to a solicitation are not qualification requirements. Specifically, in *Oracle*, the Federal Circuit held that the challenged solicitation requirement was not a "qualification requirement" because it did not impose an extraneous, pre-award testing or quality-assurance demonstration of the type regulated by Congress, but instead operated as an intrinsic performance specification tied to the agency's needs and the offeror's ability to perform on the required schedule.[10] 975 F.3d at 1293. The Circuit explained that the statute distinguishes between external prerequisites unrelated to the specific procurement and solicitation-specific performance specifications that ensure the contractor can meet the contract's demands from the outset. *Id.* Because the requirement evaluated whether an offeror's existing capabilities could meet the solicitation's minimum technical and security posture on the required timeline, *Oracle* concluded it was an ordinary responsibility or technical-capability criterion, not a statutory "qualification requirement," and therefore did not trigger the requirement for written justification and public notice obligations. *Id.* Thus, the central question is whether the pre- and post-December 2025 requirements constitute qualification requirements under the governing case law.

It is sensical that when an agency requires adherence to a drawing or technical data package, those specifications operate as ordinary performance or responsibility criteria intrinsic to the procurement itself, rather than stand-alone qualification requirements. In that posture, the statute's justification and notice procedures are not triggered because the agency is simply defining what it needs, not imposing an external prequalification regime. Relying on this proposition, the United States responds that no qualification requirement exists. (Def.'s xMJAR at 35). However, the Court finds that assertion strained given the surrounding circumstances. Specific to the December 2025 requirements, the United States would have the Court overlook the title of a document titled "RUNFLAT LUBRICANT QUALIFICATION REQUIREMENTS: Testing Requirements for [ ] Runflat Lubricant." (AR 2352 (citation modified); Def.'s xMJAR at 36 ("The latter source – despite its document title – is not a qualification requirement within the meaning of § 3243 because it does not describe testing that must be completed 'before award of a contract.'")). It is not persuasive for an agency to characterize a set of requirements as "qualification requirements" and then later contend that the term carries a different meaning for purposes of § 3243. An agency's own labeling and treatment of such requirements are inconsequential when determining whether the statute applies. It is, in fact, highly probative.

As the United States characterizes it, because "these testing requirements allow firms to become an approved source for the lubricant" and "the lubricant solicitations expressly provide the opportunity for unapproved sources to submit alternate offers[,]" it is removed from the purview of § 3243. (Def.'s xMJAR at 36). However, the existence of an alternate-offer pathway does not alter the statutory definition; § 3243(c)(3) expressly requires agencies to accept offers from unapproved sources. DLA's guidance likewise states that awards will not be delayed due to

---

[10] *Oracle*'s ruling was specific to qualification requirement rules dictated in 10 U.S.C. § 2319. 975 F.3d at 1287. That provision has since been transferred to 10 U.S.C. § 3243, one of the provisions Toota relies on. (Pl.'s MJAR at 30).

pending SAR or alternate-offer evaluations. (AR 45). The United States identifies no authority holding that the availability of alternate offers removes a testing regime from the scope of § 3243.

That said, application of § 3243 is not dispositive in Toota's favor.[11] Subsection § 3243(b)(2) requires that an agency "specify in writing and make available to a potential offeror *upon request* all requirements which a prospective offeror . . . must satisfy in order to become qualified." *Id.* (emphasis added). These specifications are not an automatic requirement. After Toota requested the testing requirements in the spring of 2025, TACOM belatedly provided Toota with the requested testing procedures. However, a belated production is still a production. (*See* AR 2353). Any delay in the production was not prejudicial to Toota in light of the RFQ's cancellation.

To the extent Toota challenges the December 2025 testing elaboration as a post-litigation violation, the Court disagrees. Section 3243 requires a written justification when establishing a qualification requirement, not when clarifying testing steps that have existed since 1995. *See* 10 U.S.C. § 3243(b)(2). The December 2025 document did not alter the item's source-controlled nature or restrict competition. Any initial written justification required by § 3243(b)(1) would have been prepared when the alleged qualification requirement was first established in 1995. (AR 1). The statute does not require a new justification each time the agency issues a solicitation enforcing an existing requirement. For similar reasons, Toota's argument regarding a seven-year revalidation fails. (Pl.'s MJAR at 32). Section 3243 requires revalidation only when an agency enforces a qualified manufacturers list, and the record contains no evidence that DLA enforced such a list before Toota's inquiry.

Toota further contends that DLA violated 10 U.S.C. § 3243 by failing to provide the prompt qualification opportunity and timely feedback that the statute requires. (Pl.'s MJAR at 32 (citing 10 U.S.C. § 3243(b)(4), (6))). Toota asserts that when it submitted its initial SAR in October 2024, no valid qualification requirement existed for the lubricant, and DLA took no steps to correct that deficiency. (*Id.* at 33). Instead, Toota alleges, DLA repeatedly delayed review of its SAR throughout 2024 and 2025. (*Id.* at 33–34). According to Toota, DLA did not begin reviewing the October 2024 submission until February 2025, despite internal tracking reflecting a January 27 due date. (*Id.*). Toota further asserts that, after DLA instructed it to resubmit the same SAR in May 2025, the agency did not forward the package to TACOM until July 22, 2025, and then failed to complete its review before the October 1, 2025 government shutdown, notwithstanding its stated expectation of issuing a determination by September 30, 2025. (*Id.* at 34). In Toota's view, these delays show that DLA neither provided a prompt opportunity to qualify nor timely informed Toota of the reasons qualification was not attained.

---

[11] The United States alleges that, with respect to the lubricant, DLA's role is limited to issuing solicitations consistently and forwarding SAR submissions to the responsible design activity. (Def.'s xMJAR at 37–38). As the United States characterizes Toota's claims, the only DLA action Toota challenges is its evaluation of Toota's alternate offers, (Pl.'s MJAR at 34), and each of the other alleged wrongs (interpretation, and application of testing requirements) was taken by the Army, not DLA. (Def.'s xMJAR at 38). Because Toota has not shown statutory non-compliance, the Court declines to analyze that issue.

(*Id.*). Toota also argues that DLA failed to promptly and substantively evaluate its alternate offers pursuant to § 3243(d). (*Id.*). Taken together, Toota argues that DLA's delays in reviewing its SAR and its failure to evaluate alternate offers deprived it of the statutory opportunity to demonstrate its ability to meet the agency's standards and to compete for award. (*Id.* at 33–35).

Toota is correct that DLA's cancellation expressly recognized that it had not yet conducted a substantive review of Toota's offer. (AR 759). That cancellation, however, was undertaken as corrective action in response to Toota's GAO protest, and the agency subsequently completed the review Toota sought. (*Id.*). The United States responds that any error associated with RFQ 0165 was cured when DLA canceled the solicitation after the GAO protest. (Def.'s xMJAR at 45 (citing AR 759)). Under these circumstances, the prior cancellation cannot be deemed prejudicial, as it effectuated the corrective action Toota itself requested. As to the remaining solicitations, it is likewise true that Toota cannot show prejudice because it was not an approved source, had not completed the required testing, and therefore had no substantial chance of award. *See Bannum*, 404 F.3d at 1353.

Even accounting for the delay in reviewing Toota's SAR, TACOM completed its SAR evaluation within approximately 180 non-shutdown days, consistent with the SAR Guide. (AR 47). The SAR denial rested on numerous deficiencies unrelated to the December 2025 elaboration of testing requirements. (AR 2343–2347). TACOM's subsequent clarification of testing requirements merely reflected the longstanding requirements of the Drawing. (AR 2346, 2353). The record further shows that alternate offers remained available to non-approved sources before and after December 2025. (AR 74–75). Except for a single procurement that resulted in corrective action, Toota has not demonstrated that DLA erred in evaluating its alternate offers. Toota's unequal-treatment claim likewise fails, as Hutchinson has been the approved source since 1995 and has consistently demonstrated compliance with the Drawing. (*See* AR 1). Although administrative delays occurred, including the failure to forward Toota's May 1, 2025 SAR until July 22, 2025, (AR 2021), these delays do not establish a statutory violation. Overall, even if DLA's handling of the SAR or alternate offers was imperfect, Toota cannot establish the prejudice necessary to obtain relief.

The Court likewise cannot conclude that the testing requirements prescribed by the Drawing are arbitrary, capricious, or otherwise improper based solely on Toota's disagreement with their substance. Judicial review in bid protests does not permit the Court to substitute its judgment for the technical determinations made by procurement officials. *See Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 104 (2006). As this Court has repeatedly emphasized, it "must especially defer to the agency's technical evaluations, past performance ratings, and other 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials.'" *Mortg. Contracting Servs. LLC v. United States*, 153 Fed. Cl. 89, 126 (2021) (quoting *J.C.N. Constr., Inc. v. United States*, 107 Fed. Cl. 503, 510 (2012)). This deference is at its apex where, as here, the challenged requirements relate to national defense and safety; agencies are afforded "broad discretion to determine their minimum needs" in such contexts. *Savantage*, 595 F.3d at 1286; *Hesco Bastion Ltd. v. United States*, 136 Fed. Cl. 146, 155 (2018). Moreover, even if a protestor believes a requirement is unnecessary or overly burdensome, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion."

*Honeywell*, 870 F.2d at 648 (quoting *M. Steinthal & Co.*, 455 F.2d at 1301). Here, the record reflects that TACOM's engineering judgment regarding the physical properties required by the Drawing, including the risks associated with incompatible lubricants, is supported by the evidence and falls squarely within the agency's discretion to define its minimum needs. (AR 2346). Absent contrary evidence, Toota's disagreement with the technical content of those requirements cannot support a finding that they are wrongful.

### E.  Prejudice and Injunctive Relief

Toota cannot demonstrate prejudice even if DLA committed the errors alleged. A protestor must show that any alleged "errors in the procurement process significantly prejudiced" it, *Bannum*, 404 F.3d at 1353, and the burden "lies squarely on the plaintiff[.]" *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 288 (2024). There is "no presumption of prejudice," even where agency action is irrational. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). Although "multiple errors might cumulatively establish prejudice," *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010), a protestor must still show that correcting the errors would have increased its "chances of securing the contract[.]" *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016) (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

Here, the United States argues that Toota cannot make that showing because, based on the substance of its offer, none of the alleged errors—including delays in reviewing its SAR or alternate offer, the absence of a written justification, or the purported wrongful imposition of qualification requirements—could have altered the outcome. (Def.'s Reply at 19). The United States characterizes Toota's response as asserting only that it suffered "concrete prejudice," but never identifying what that prejudice is or explaining how it is concrete. (*Id.* (citing Pl.'s Resp. at 32)). As the United States notes, Toota does not address how it could have had any chance of award, given the independent solicitation requirements involving the Drawing, ISO scope, JCP eligibility, export-control restrictions, and first article testing. (*Id.* at 19–20). Because these deficiencies exist regardless of any alleged procedural error, Toota cannot show that its prospects would have improved had DLA acted differently. For example, were the Court to find that DLA erred by not preparing a written justification for the December 2025 testing requirement, that omission caused no prejudice because Toota still could not meet the other mandatory requirements. Accordingly, even assuming that an error occurred, the outcome would be the same: Toota's SAR would have been denied.

Because Toota has not demonstrated any actionable error that materially affected its ability to compete, it likewise cannot obtain injunctive relief. Injunctions are a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). To obtain a permanent injunction, a protestor must show: (1) success on the merits; (2) irreparable harm absent an injunction; (3) that the balance of harms favors relief; and (4) that an injunction serves the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146, 153 (2020). Although no single factor is dispositive, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny relief. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). Here, because Toota has not established success

on the merits—whether with respect to its SAR-related allegations, its alternate-offer claims, or its asserted statutory violations—further analysis of the remaining factors is unnecessary. Toota's request for permanent injunctive relief must therefore be denied.

### III.    Conclusion

For the reasons explained above, the Court concludes that Toota has not demonstrated that the agency acted arbitrarily, capriciously, or contrary to law. The lubricant procurements were governed by FAR Part 13, not CICA's full-and-open-competition requirements; DLA's invocation of SEPA was adequately documented when used; there has been no patent violation of § 3243; and the denial of Toota's SAR was reasonable and supported by substantial evidence. Although the record reflects administrative missteps and internally inconsistent conduct, Toota has not shown prejudice or entitlement to relief.

Accordingly, the Court **DENIES** Toota's Motion for Judgment on the Administrative Record, (ECF No. 18), and **GRANTS** the United States' Cross-Motion for Judgment on the Administrative Record, (ECF No. 19). The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this Memorandum Opinion within **seven (7) days** of its entry to allow the Court to file a public version of the Opinion.[12]

**IT IS SO ORDERED.**

s/    David A. Tapp
DAVID A. TAPP, Judge

---

[12] The Court requests a prompt turnaround for the public version of this decision so that the parties in the related bid protest may evaluate it before the Court issues its forthcoming ruling. *The Toota Group, LLC, v. United States,* Case No. 26-232 (Tapp, J.).